**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250128-U

Order filed June 2, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-25-0128 Circuit No. 20-CF-405 |
| ROBERTO CARIAS-MORAN, | ) ) ) | Honorable Howard C. Ryan, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Justices Anderson and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1        *Held*:  Defendant did not receive ineffective assistance from plea counsel or postplea counsel.

¶ 2        Defendant, Roberto Carias-Moran, appeals his conviction. He argues that his conviction should be vacated, and he should be allowed to withdraw his guilty plea because he received ineffective assistance of counsel from postplea counsel, where postplea counsel failed to move to withdraw his guilty plea on the basis that it was involuntary due to plea counsel's ineffectiveness. Defendant argues that plea counsel was ineffective because he failed to present

the claim of an unlawful pretextual traffic stop and failed to argue that defendant did not provide consent to search his truck in light of the officer's failure to use the correct Spanish word for "search" when seeking consent. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant with unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(1)(D) (West 2020)) and alleged that defendant was in possession of more than 900 grams of a substance containing heroin. The court ordered a Spanish-speaking interpreter to be present for court proceedings to assist defendant. Defense counsel filed a motion to quash and suppress evidence obtained from defendant's vehicle and any statements made by defendant subsequent to his arrest. The motion argued that defendant did not freely and voluntarily consent to the officers' search of his vehicle. The motion further alleged that defendant grew up in El Salvador, did not speak or understand English, attended only a few months of first grade, and had no other formal education.

¶ 5        The court held a hearing on the motion. Trooper John Sieczka testified that he was with the Illinois State Police criminal patrol. At the time of the hearing, he had been conducting criminal interdiction with a criminal patrol team (CRIMPAT) unit for approximately five years. Sieczka testified that CRIMPAT is a niche unit and gave the example of an officer having a niche for writing speeding tickets. He stated that his niche was "digging a little bit further during traffic stops." Sieczka attended multiple trainings. A presentation and various enlarged slides from that presentation regarding CRIMPAT policies and procedures were introduced into evidence. Sieczka identified a slide which set forth the purpose of CRIMPAT. The slide stated that the "program focuses on establishing a foundation of well-trained and motivated officers dedicated to patrolling and interacting with the public in a manner to reduce fatality rates on

2

Illinois highways, build and maintain positive relationships, and detect criminal or terroristic activity through legal and professional interdiction methods." Another slide stated that the goal of CRIMPAT was "to consistently identify, apprehend, and convict major criminals traveling through this State. We do this as the last line of defense in protecting our communities or other communities from the criminal element." Additionally, the materials stated that they "make a high volume of professional traffic stops and aggressively enforce all traffic laws in respect to the Illinois Vehicle Code."

¶ 6        On November 12, 2020, Sieczka was assigned to a CRIMPAT team and was working with another trooper. They had a narcotics detection canine with them. Sieczka's duty on that date was to make traffic stops. Sieczka testified that he stopped defendant to perform a level 3 motor carrier safety inspection. He testified that he conducts these inspections on a daily basis. He was asked why he decided to do the inspection. Sieczka replied, "that's what we do when we pull over truck tractor semi trailers." He pulled over defendant's vehicle because it was "[j]ust one of many on the road." Sieczka stated that, from a criminal patrol perspective, defendant's vehicle did stand out because it had a large lock on the trailer, the "DOT number was one vehicle, one driver," and the DOT number was "flashy." The lock obscured the seal on the vehicle, which is placed by either the driver or the company to prevent tampering with the trailer's contents. Sieczka does not need a reason to stop a vehicle for a motor carrier safety inspection.

¶ 7        Sieczka testified that he approached the vehicle and spoke with defendant. He asked defendant for the "standard documents; driver's license, insurance, registration, his logbook." Sieczka did not believe he had to repeat his instruction. Defendant provided the requested documents. Defendant's hand was shaking when he provided the documents. Sieczka looked at

the interior of the vehicle, which is standard procedure. After receiving defendant's documents, Sieczka went back to his vehicle, checked defendant's driver's license, made sure the registration was valid, checked the logbook, input the information into the computer, and printed the level 3 inspection paperwork. He returned defendant's documents to him and asked if he had any questions. Defendant did not have any questions. Sieczka advised defendant he had some questions and proceeded to question whether defendant had any marijuana, cocaine, or heroin in his vehicle, which defendant denied. Sieczka asked defendant for consent to search his truck. He did not tell defendant he was free to leave. Sieczka was unsure of how he worded his request for consent to search. However, the video of the encounter, which was admitted into evidence, showed that he stated, "If I asked you to search, is that ok?" Defendant responded, "that's ok." He did not ask defendant if he spoke English but defendant spoke English to him during the encounter. When defendant spoke English, it was short words and not a conversation but defendant's responses were appropriate for the questions asked. Sieczka testified that he believed that defendant "understood my question for him to search the vehicle was for me to search his vehicle." Sieczka also had Trooper Julio Castillo, who was a native Spanish speaker, ask for consent in Spanish.

¶ 8 Castillo testified that he was with the Illinois State Police. He had been assigned to CRIMPAT. Castillo spoke Spanish throughout his life and took Spanish classes in high school and college. During the stop of defendant, Castillo translated for defendant and Sieczka. Castillo, in Spanish, asked defendant if he could search defendant's vehicle and defendant responded affirmatively. Castillo believed defendant understood him because they were talking back and forth in Spanish, having a full conversation. Castillo testified that he used the word "search, escalar" when asking to search defendant's vehicle. He stated that defendant was required to

4

speak English as a semitruck driver because it is a legal requirement to read and write in English to receive a CDL license.

¶ 9 Defendant testified that he understands very little English. He came to the United States in 1987. Defendant believed he had his CDL for approximately eight years. He has previously been stopped for motor carrier inspections but has not had his vehicle searched before. When he was stopped, the officer asked for his license, registration, permits, and insurance—all the documents "they always ask for." When asked if the officer left after getting the documents, defendant responded "Yes, but he never tells me to leave." Defendant did not remember if the officer asked him any questions when he returned his documents. When asked if the officer asked him for permission to search, defendant stated "Yeah, but I didn't understand the one that was speaking English." A different officer spoke to him in Spanish. Defendant was asked what the officer asked him in Spanish and he responded, "That word escalar, I don't understand that word." Defendant testified he did not know what the word escalar meant. He was asked if he understood that the officers were asking to search his truck and he stated, "they were already inside." Defendant stated that when the officers got in his vehicle he thought they wanted to search it and look at everything. When defendant was asked if he gave the officers consent to search, he stated he "thought it was okay." Defendant stated, "that word escalar, I thought they wanted to look or just look at things or look it over, something like that." On cross-examination defendant was asked "So when the officers used those words in Spanish, it's your testimony that you thought they wanted to look over your truck?" and he responded, "Something like that." Defendant testified that he knew how to say he does not understand in Spanish but never said that to the officers. Defendant never asked the officers to clarify what they meant by looking over the truck. Defendant testified "They wanted to look at the truck. I said well, look at it."

¶ 10    Following the testimony, defense counsel argued that defendant did not fully understand what the officers' request to search would entail. He argued that even if defendant understood what the word search meant, he did not understand that it meant they would be able to look through everything. The State argued that defendant was asked for consent to search in both Spanish and English. The State further argued that because defendant was in the United States for over 30 years, it was unrealistic that he would not speak enough English "to get through this stop." Additionally, the State noted that defendant had a CDL for eight years and the CDL required tests in English. The State also argued that based upon the officer's request for consent in Spanish, defendant understood they wanted to look over his truck, which meant he understood they wanted to search.

¶ 11    The court found that defendant was not credible. The court stated that he has had a CDL license for eight years. Additionally, the court stated that defendant's testimony that he did not understand the Spanish word for search "did him*** in" as far as his credibility. The court found that "You can't not understand what that word is in Spanish based on his background." The court stated that "If this was not somebody driving a commercial vehicle, but maybe in a private car, maybe his pretense of thinking that he understands English only when it's convenient and he understands Spanish only when it's convenient may have some sense. But not this defendant who has a CDL license for eight years." The court noted that the video showed that defendant and Castillo "were having a great conversation." The court found that defendant's "testimony about his lack of belief or understanding or lack of intelligence is baloney ***; from the evidence in this case, from the video, from the fact he has a CDL license." The court noted that defendant was not asked, but volunteered, that the officer never told him he was free to leave. The court

6

then questioned, if defendant did not understand what was going on, how did he understand he was never told he could leave. The court denied the motion to suppress.

¶ 12      Defendant pled guilty pursuant to a blind plea, with the State agreeing to ask for no more than 30 years' imprisonment. The court sentenced defendant to 30 years' imprisonment. Defendant filed a motion to withdraw his guilty plea and vacate the judgment and sentence and a motion to reconsider his sentence. Subsequently, defense counsel withdrew and new counsel was appointed. The new postplea counsel filed a motion to vacate defendant's guilty plea. The motion argued that plea counsel was ineffective in that he failed to, among other things, obtain an interpreter so that he could effectively communicate with defendant while defendant was in jail.

¶ 13      At the hearing on the motion to vacate, defendant's plea counsel testified. He testified that he had been practicing for 46 years and practiced in criminal defense. Plea counsel testified that defendant spoke some English but was not fluent. Plea counsel does not speak Spanish. An interpreter was present for all court dates. Plea counsel met with defendant at the jail thirty or more times. When he met with defendant, he sometimes had a court-certified interpreter present and other occasions he had a private interpreter with him, although one or two times he may have met with defendant by himself. Defendant testified that plea counsel visited him in jail three or four times. He testified that plea counsel always had an interpreter with him. Sometimes it was the court interpreter and other times it was someone else. The other person was fluent in Spanish. Defendant testified that he speaks a little English. The court denied the motion. Defendant appeals.

¶ 14                                II. ANALYSIS

¶ 15        Defendant argues that his conviction should be vacated and the matter remanded to allow him to withdraw his guilty plea because postplea counsel was ineffective for failing to move to withdraw his guilty plea based on two specific instances of ineffectiveness by plea counsel. Specifically, he argues that plea counsel was ineffective for failing to move to suppress evidence based upon the allegation that he was subjected to an unlawful pretextual traffic stop. While defendant does not dispute that the police can stop and inspect commercial vehicles pursuant to the Illinois Vehicle Code (625 ILCS 5/18b-100 *et seq.* (West 2020)) and the Illinois Administrative Code (92 Ill. Adm. Code 396 *et seq.* (West 2020)), he argues that the police cannot utilize such an administrative stop as a pretext to search for evidence of criminal conduct. Defendant argues that although he was allegedly stopped for the police to conduct a level 3 motor carrier safety inspection, that was a pretext to search for evidence of criminal activity. Additionally, defendant argues that both counsel failed to investigate the meaning of the Spanish word, escalar, used by Castillo to obtain consent to search defendant's vehicle and also failed to argue that defendant did not knowingly consent to the search of his vehicle when the word used by Castillo to obtain consent, escalar, means climb rather than search.

¶ 16        "To establish a claim of ineffective assistance of counsel, a defendant must prove both deficient performance and prejudice." *People v. Smith*, 195 Ill. 2d 179, 187-88 (2000). The failure to establish either deficient performance or prejudice precludes a finding of ineffective assistance of counsel. *People v. Cherry*, 2016 IL 118728, ¶ 31. "Counsel's performance is measured by an objective standard of competence under prevailing professional norms." *Smith*, 195 Ill. 2d at 188. "[T]he effectiveness of *** counsel must be assessed against an objective standard of reasonableness from the perspective of the time of the alleged error and without

8

hindsight." *People v. Reed*, 2014 IL App (1st) 122610, ¶ 66. "[E]ffective assistance of counsel refers to competent, not perfect, representation." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). There is a "strong presumption that counsel's performance fell within a wide range of reasonable professional assistance." *Id.* "To show actual prejudice, defendant must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Horton*, 143 Ill. 2d 11, 23 (1991) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶ 17                                   A. Alleged Pretextual Stop

¶ 18        "A judicial warrant and probable cause are not needed where the search or seizure is justified by special needs, beyond the normal need for law enforcement ***." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (internal quotation marks omitted). "But those exceptions do not apply where the officer's purpose is not to attend to the special needs or to the investigation for which the administrative inspection is justified." *Id.* at 737. "One of the fundamental principles of administrative searches is that the government may not use an administrative inspection scheme as a pretext to search for evidence of criminal violations." *People v. Madison*, 121 Ill. 2d 195, 209 (1988), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990). However, "[i]f evidence of criminal activity is discovered during the course of a valid administrative search, it may be seized under the 'plain view' doctrine." *Michigan v. Clifford*, 464 U.S. 287, 294 (1984). "[T]he presence of a criminal investigatory motive, by itself, does not render an administrative stop pretextual." *United States v. Orozco*, 858 F.3d 1204, 1213 (2017). "Nor does a dual motive—one valid, and one impermissible." *Id.*

9

¶ 19        Initially, we note that this case is distinguishable from those cited by defendant wherein the court found the search or stop to be pretextual. For example, in *Orozco*, *People v. Smith*, 2023 IL App (3d) 230060, and *People v. Won Kyu Lee*, 2014 IL App (1st) 130507, the police chose to conduct an administrative search or make an administrative stop of the defendants because they already had information indicating that the defendants were involved in criminal conduct and/or that criminal evidence would be found. Specifically, in *Orozco*, 858 F.3d at 1206, 1208-09, the officers received a tip that the defendant's vehicle could possibly contain drugs and an officer involved in the stop testified that it was common knowledge that if they suspected criminal activity, they could utilize their administrative powers to make a stop. In *Smith*, 2023 IL App (3d) 230060, ¶¶ 52-56, the court found that an inventory search was a pretext to search for criminal evidence where the officer made contact with defendant because he knew defendant was a suspect in a shooting and there was no evidence that the officer actually completed an inventory of the vehicle. In *Won Kyu Lee*, 2014 IL App (1st) 130507, ¶¶ 4-12, an audit, purportedly to ensure Medicare claims were billed and paid in the appropriate manner, was conducted to gather criminal evidence, with the auditor working with and having frequent communication with law enforcement, including the Federal Bureau of Investigation. In that matter, the State conceded that the administrative exception to the warrant requirement did not apply. *Id.*, ¶ 22. Here, Sieczka testified that defendant's vehicle was stopped because it was just one of many on the road that day. The officers had not received any information that criminal evidence would be located in defendant's truck. While not dispositive of the issue, it bears on the reasonableness of plea counsel's failure to pursue the pretext argument.

¶ 20        Additionally, during the hearing on the motion to suppress, plea counsel questioned Sieczka regarding his duties on the day he stopped defendant, his reasons for stopping defendant,

10

and CRIMPAT's goals or purpose. Plea counsel also admitted into evidence policies and procedures of CRIMPAT. Sieczka testified that his duty was to make traffic stops and that he stopped defendant because he was just one of many vehicles on the road that day. Sieczka stated that he conducted a level 3 inspection on defendant's vehicle because that is what he does when he stops semitrucks. Information from the policies and procedures of CRIMPAT showed that the "program focuses on establishing a foundation of well-trained and motivated officers dedicated to patrolling and interacting with the public in a manner to reduce fatality rates on Illinois highways" and building and maintaining positive relationships. Additionally, the materials stated that they "make a high volume of professional traffic stops and aggressively enforce all traffic laws in respect to the Illinois Vehicle Code." In responding to questions regarding why he pulled defendant over, Sieczka testified that the lock on defendant's trailer and the DOT number caught his attention. Additionally, CRIMPAT's policies and procedures indicated that the program focused on detecting "criminal or terroristic activity through legal and professional interdiction methods" and that the goal of CRIMPAT was "to consistently identify, apprehend, and convict major criminals traveling through this State."

¶ 21    Taken together, this evidence could be viewed as showing that, in pulling defendant over, Sieczka had both a motive to conduct the level 3 inspection, in line with CRIMPAT's stated policy of conducting a high volume of traffic stops, and to search for evidence of crime. Thus, this evidence, when considered altogether, could lead a reasonable, competent attorney to conclude that the evidence showed that there was a dual motive, one valid and one impermissible, such that an argument that the stop for a level 3 inspection was an impermissible pretextual stop would be futile. As such, we cannot say that plea counsel's failure to make the pretext argument constituted deficient performance. Therefore, defendant cannot establish that

11

plea counsel provided ineffective assistance. As plea counsel was not ineffective, postplea counsel cannot be ineffective for failing to argue that he was.

¶ 22                    B. Failure to Investigate the Meaning of the Word Escalar

¶ 23    "The validity of a consent search depends on the voluntariness of the consent." *People v. Anthony*, 198 Ill. 2d 194, 202 (2001). "The voluntariness of the consent is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving the consent was truly voluntary." *Id.*

¶ 24    Here, plea counsel argued that consent was not voluntary, largely on the basis that defendant did not understand the officers' requests to search and what a search would entail. Plea counsel does not speak Spanish and utilized an interpreter in the many meetings he had with defendant. During the hearing on the motion to suppress, plea counsel asked Castillo, who spoke Spanish his entire life, the words he used to seek consent from defendant and had him spell the word. When defendant, who is a native Spanish speaker, was testifying, plea counsel questioned him regarding the word Castillo used—escalar—and defendant testified he did not understand that word. Defendant did not testify that the word meant to climb rather than to search or that he thought the officer asked to "climb" his truck. Defendant's argument for the motion to suppress focused on the allegation that he had little education and did not understand the request to search. As such, the fact that he is testifying that he did not understand the word used by Castillo would not necessarily make a reasonably competent attorney question what the word meant, especially when there had already been testimony, from an officer who spoke Spanish throughout his life, that it meant search. Thus, we cannot say that plea counsel's failure to further investigate the meaning of the term escalar constituted deficient performance. In hindsight, it may have been

12

more thorough to do so, but defendants are not entitled to perfect representation, only competent representation (see *Palmer*, 162 Ill. 2d at 476).

¶ 25        Further, defendant testified that the officers wanted to look at his truck, and he told them to look at it. Additionally, when asked if he gave the officers consent to search his truck, he testified that he thought it was okay. This testimony indicates that defendant knew the officers wanted to search his truck and he gave consent, regardless of Castillo's use of the term escalar. Moreover, Sieczka asked for consent to search in English and defendant responded that it was ok. Sieczka testified that defendant appeared to understand him and his answers were appropriate to the questions asked. The court did not find defendant to be credible during the hearing,[1] and specifically did not believe his purported inability to understand English, as the court noted defendant's "pretense" of only understanding English when it was convenient. Therefore, it appears the court would have found defendant understood the request to search and gave consent regardless of the meaning of escalar. Thus, even if plea counsel had investigated the meaning of the word escalar and raised that as the reason that defendant did not understand Castillo was asking for consent, there is no reasonable probability that the result of the motion to suppress would have been any different.

---

[1]Defendant argues that the court's finding that defendant was not credible would be undermined if it had been informed of the true meaning of the word escalar. However, the court found defendant to be incredible, partly on the basis that he testified he did not understand the word escalar. The court stated that defendant was not credible because he testified he did not understand the Spanish word for search, meaning the word escalar that was used by Castillo. However, the court's comment that defendant could not not understand the Spanish word with his background makes it clear that the court believed defendant was feigning the inability to understand his native language, Spanish. This assessment would be true, regardless of the actual meaning of the word escalar, as defendant testified he did not understand that word. Defendant, on appeal, has asserted that the word means to climb. This is an ordinary word that you would expect a native speaker to understand, rather than some highly technical word. Although there could be different dialects, defendant has provided nothing to indicate that this word was only utilized in some specific Spanish dialect.

¶ 26 Based on the foregoing, we conclude that plea counsel did not provide ineffective assistance by failing to investigate the meaning of the word escalar. As plea counsel was not ineffective, postplea counsel cannot be ineffective for failing to argue plea counsel's ineffectiveness on this issue.

¶ 27                                     III. CONCLUSION

¶ 28 The judgment of the circuit court of La Salle County is affirmed.

¶ 29 Affirmed.